### In re WILLIAMS COMMUNICATIONS GROUP, INC. and CG AUSTRIA, INC., Debtors.

#### No. 02–11957(BRL).

United States Bankruptcy Court, S.D. New York.

Oct. 26, 2005.

Erica M. Ryland, New York, NY, for Debtors.

## MEMORANDUM DECISION ON MO-TION FOR DIRECTIONS TO IM-PLEMENT CONSENT ORDER

BURTON R. LIFLAND, Bankruptcy Judge.

Raymond A. Levites (the "Administrator"), the Administrator of the Securities Holder Channeling Fund (the "Fund"), moves for this Court's directions in respect of the implementation of the "Consent Order (1) Appointing Channeling Fund Administrator and (2) Approving Securities Holder Channeling Fund Distribution Procedures" entered on November 3, 2003 (the "Fund Order"). The affected distributee parties-in-interest have filed position papers in response to the motion. None have challenged this Court's jurisdiction to determine the Administrator's motion.

### Background

On September 20, 2003, this Court entered an order confirming the Second Amended Joint Chapter 11 Plan (the "Plan"), of Williams Communications Group, Inc. and its direct and indirect subsidiaries (together, "Williams"). The Plan, which was proposed by the Debtors, together with the creditors' committee appointed in the Chapter 11 cases (the "Creditors' Committee"), and Leucadia National Corporation ("Leucadia"), provides, among other things, that certain claims of securities holders (the "Securities Plaintiffs") asserted in a consolidated secu-

rities fraud class action case [1] (the "Securities Action"), pending in the United States District Court for the Northern District of Oklahoma (the "Securities Court"), shall be channeled to and satisfied from a Securities Holder Channeling Fund (the "Fund").[2] The Plan contemplated that the Court would enter an order establishing procedures for the Securities Plaintiffs to make claims against the Fund to the extent the claims were liquidated in the Securities Action. In return, the Securities Plaintiffs would be enjoined from pursuing a number of parties, including the officers and directors of Williams.

Under the Plan and the Fund Order, the Fund assets consist of (1) any recovery that could be obtained under Williams' directors and officers liability insurance policies (the "D & O Insurance") and (2) 2% (1 million shares) of the WilTel Communications Group, Inc. (WilTel) common stock (the "Stock"), which shares have since been converted to stock of Leucadia. Pursuant to the Fund Distribution Proce-

dures, the assets of the Fund are to be distributed after receipt of an order of the Securities Court, or other court of competent jurisdiction, approving a Plan of Allocation among the Securities Plaintiffs. Assets in the Fund remaining after distribution, if any, pursuant to the Plan of Allocation, are to be distributed 50% to Williams' unsecured creditors and 50% to Leucadia.

The parties to the Securities Action are currently involved in mediation. In connection with that mediation, an issue arose with respect to the assets of the Fund and whether the Stock in the Fund may be fungibly used to satisfy the claims of the Securities Plaintiffs before the D & O Insurance is exhausted. Lead Plaintiff and the insurance carriers [3] contend that the claims (the "Claims"), established in the Plan of Allocation should be satisfied equally, i.e., pro rata, out of the D & O Insurance and the Stock. However, the parties who negotiated the Plan—Leuca-

---

1. On and after January 29, 2002, multiple securities fraud class actions against Williams were filed in the Securities Court and subsequently consolidated. (In re: Williams Securities Litigation, Case No. 02–CV–72–H (M)). Those complaints alleged that Williams, its former corporate parent, The Williams Companies ("TWC"), and certain of their respective officers and directors made false and/or misleading statements and engaged in a scheme to defraud purchasers of the Debtor's securities during the period July 24, 2000 through and including April 22, 2000. Subsequently, Alex Meruelo was appointed Lead Plaintiff by the Securities Court.

2. The Plan defines the Securities Holder Channeling Fund as "(a) the right to receive 2% of the New WCG Common Stock (on a fully-diluted basis), to the extent that holders of Securities Holder Channeled Actions become entitled to receive such stock pursuant to the Securities Holder Channeling Fund Distribution Procedures; and (b) any recoveries that can be obtained from officer/director liability insurance policies of the Company or

insurance carriers that cover officers and directors of the Company or the Company's obligation to indemnify its officers and directors." (Plan, Attachment I, Section 1.1(102)).

3. Opportunistically, Federal Insurance Company ("Federal"), one of the issuers of the D & O insurance policies, filed a pleading with this Court arguing that the Stock "shall *first* be utilized to pay and [sic] settlement or judgment in the [Securities Action]" before *any* insurance proceeds are used. Of course, Federal concedes that "neither Federal nor the other insurance companies were parties to these proceedings, and thus did not participate in the creation of the Channeling Fund and in negotiation of the terms under which it was established." *See* Memorandum of Third–Party Federal Insurance Company in Response to Channeling Fund Administrator's Motion for Instructions as to Implementation of Consent Order Dated November 3, 2003 Approving Securities Holder Channeling Fund Distribution Procedures, dated October 6, 2005 (ECF # 606).

dia, counsel for the Debtor and counsel for the Creditors' Committee—assert that the Claims are to be first satisfied by the D & O Insurance and, if such insurance is insufficient to satisfy the Claims, the Securities Plaintiffs can avail themselves of the Stock thereafter. ·All parties agree that this dispute is ripe for resolution by this Court. Based upon a plain reading of the documents and the representations of the parties who negotiated the Plan, I find that the Stock is simply a backstop against a potential judgment or settlement in excess of the D & O Insurance. As explained below, I find that this is the allocation that best comports with and is supported by the language of the Fund Order and the intention of the parties.

## Discussion

█ Pursuant to section 7.1(g) of the Plan, this Court retained jurisdiction to resolve any disputes with respect to the Fund Distribution Procedures. *See Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 230 (2d Cir.2002).

During the Plan negotiation process, the Debtor, the Creditors' Committee and Leucadia had initially agreed to resolve the Securities Claims by making the D & O Insurance, approximately $135 million, exclusively available in a "channeling fund" for the Securities Plaintiffs.[4] When the Securities Plaintiffs wanted additional consideration for the Claims, Leucadia agreed to contribute from its shares under the Plan, one percent of the reorganized debtor's shares to the Channeling Fund if the

Creditors Committee's constituency (who had negotiated to receive 55% of the reorganized debtor's shares) made the same contribution.[5] Leucadia and the Creditors Committee apparently believed that the D & O Insurance was adequate to satisfy the Securities Claims but agreed to backstop the insurance with the Stock so long as the Stock would revert to the creditors and Leucadia if not needed to satisfy the Securities Claims. Because of a lender-imposed deadline for confirmation of the Plan, the Channeling Fund was described generally in the relevant Plan documents with the details to be worked out after confirmation.

The Securities Holder Channeling Fund Distribution Procedures were filed with the Court on September 6, 2002 and subsequently amended on September 29, 2002 (the "Initial Procedures"). The Initial Procedures provided, in relevant part, that on or before the tenth business day following the Effective Date of the Plan, "the [Plan] Proponents shall propose" a person to serve as administrator of the Securities Holder Channeling Fund (the "Channeling Fund Administrator") established by the Plan, and that such proposal shall be made by filing a notice identifying the proposed administrator with the Court and serving such notice upon certain parties. On October 29, 2002, Leucadia filed with the Court a "Notice of Proposed Administrator for the Securities Holder Channeling Fund" (the "Appointment Notice"). On November 22, 2002, the Lead Plaintiff filed an objection to the Appointment Notice and

4. The definition of the Fund set forth in the Plan states that the Fund shall consist of: "(a) the right to receive 2% of the New WCG Common Stock (on a fully diluted basis), *to the extent that the holders of Securities Holder Channeled Actions become entitled to receive such stock pursuant to the [Fund Distribution Procedures]*; and, (b) any recoveries that can be obtained from officer/director liability in-

surance policies of the Company or insurance carriers that cover officers and directors of the Company or the Company's obligation to indemnify its officers and directors." Section 1.1(102) of the Plan (emphasis added).

5. Unsecured creditors asserted over $4.8 billion of unsecured claims against Williams.

his own Proposed Securities Holder Channeling Fund Distribution Procedures. After negotiations among the parties, the Lead Plaintiff's objection was resolved and on November 3, 2003, this Court entered the Fund Order. Attached to the Fund Order as Exhibit A were the Fund Distribution Procedures.

The Fund Distribution Procedures provide in relevant part that:

(the "D & O policies") *shall first be utilized to satisfy the obligations of the director and officer defendants in the [Securities Action]* pending in the Securities Court, either pursuant to a judgment entered by the Securities Court or another court of competent jurisdiction or a final order approving a settlement by the Securities Court or another court of competent jurisdiction. To the extent there are any D & O Policy proceeds remaining after the satisfaction of such obligations and these remaining proceeds are available to the Fund, such proceeds shall become assets of the Fund to be distributed in accordance with the procedures set forth herein.

*See* Section II(c) of the Fund Distribution Procedures. The plain language of that section demonstrates that the D & O Insurance was to be used to satisfy the Claims first. In addition, when read in conjunction with Section III(c), which provides that any residual stock and or cash remaining after all claims and expenses have been paid shall be distributed to the unsecured creditors and Leucadia, it is clear that the parties intended that the D & O Insurance be exhausted before the Stock contributions from Leucadia and the unsecured creditors be used to pay the claims of the Securities Plaintiffs.[6]

Lead Plaintiff also argues that the D & O Insurance alone was no consideration for the Channeling Injunction because he had a right to sue for it anyway. However, the Creditors' Committee contends that without the Plan, the Committee would be entitled to the $135 million in D & O Insurance and that *it* could get to the proceeds faster than the Lead Plaintiff. Instead, through the Plan and the Channeling Injunction, the Securities Plaintiffs received the right to pursue the D & O Insurance without competition from the Committee. (See Memorandum of Official Committee of Unsecured Creditors in Support of Confirmation of the Second Amended Joint Plan of Reorganization dated September 27, 2002; ECF doc. # 373).

 Lastly, the result here is consistent with the equitable dictates of the marshaling of assets doctrine historically recognized in bankruptcy. Thus, where one creditor can reach two funds of the debtor and another creditor can only reach one of those two funds, a court will require the first creditor initially to attempt to satisfy his claim out of the asset unavailable to the second creditor. *See In re Eastern Freight Ways, Inc.,* 577 F.2d 175 (2d Cir. 1978).

**Conclusion**

The plain language of the Fund Order provides that the D & O Insurance proceeds "shall be **first utilized**" to pay the Claims of the Securities Plaintiffs. This

---

6. In at least one of his pleadings filed with in this case, the Lead Plaintiff appears to have understood that the D & O Insurance was the primary source of recovery on the Claims: "[T]o the extent that the Channeling Injunction seeks to relegate Plaintiff *primarily to the directors' and officers' liability insurance poli-* *cies,* such consideration is inadequate and even illusory to the extent that these insurers disclaim coverage for any reason." *See* Lead Plaintiffs Supplemental Objection to Confirmation of Amended Plan dated September 24, 2002 (ECF doc. # 366) (emphasis added).

"first utilized" language is clear and unambiguous. Conversely, there is no supportive language for the proposition that the D & O Insurance and the Stock be paid out "pro rata." The documents were negotiated by sophisticated, experienced counsel who were well aware of the existence and availability of simple expressive language, i.e., pro rata. Accordingly, the order settled by the Administrator shall be entered.